# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
## (Richmond Division)

| | |
|---|---|
| TVPX ARS INC., as Securities Intermediary for CONSOLIDATED WEALTH MANAGEMENT, LTD., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>GENWORTH LIFE AND ANNUITY INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 3:18-cv-00637<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff TVPX ARS Inc. ("plaintiff"), on behalf of itself and all others similarly situated, for its Complaint against defendant Genworth Life and Annuity Insurance Company ("Genworth"), states as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of plaintiff and similarly situated owners of life insurance policies issued by Genworth. Plaintiff seeks to represent a class of Genworth policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges by Genworth.

2. The policies at issue in this case are universal life policies issued on standardized form contracts by Genworth. Universal life ("UL") policies combine death benefits with a savings or investment component, often known as the "cash value" or "account value." A key

1

feature of such policies is the "unbundling" or "transparency" of the various charges and credits. This means that the monthly deductions are broken down into an array of discrete charges and credits: the COI charges, other contractually-specified costs, and crediting rates. The Dictionary of Insurance Terms describes unbundled universal life insurance as "coverage in which the investment features, mortality element and cost factors of a life insurance policy are separated, permitting each part to be independently analyzed." The COI charge is the policy's unbundled insurance component and is used to cover the insurer's mortality risk. It is also referred to in the industry as the "mortality charge" or the "pure cost of protection." Indeed, Genworth's own SEC filings expressly refer to COI charges as "mortality charges" and state that they are intended to compensate for mortality risk:

> We also collect cost of insurance charges on our variable life insurance products to compensate us for the mortality risk of the guaranteed death benefit, particularly in the early years of the policy when the death benefit is significantly higher than the value of the policyholder's account.

Genworth 2007 10-K Annual Report at 11.

3. Because COI charges are intended to compensate the insurer for mortality risk (i.e., the expected probability that the insured will die in a particular policy year), they are determined by the insurer according to its expectations of future mortality. After issuance, an insurer is required to periodically review the COI rates to confirm that they correctly capture the insurer's projected mortality costs. When mortality rates are projected to decline, the COI rates are required to be reduced.

4. This principle is inherent in the meaning of "cost of insurance," and is further embodied in the plain language of the policies at issue in this case, each of which expressly states that the COI is calculated monthly and COI rates "are determined by us according to expectations of future mortality"—and nothing else. Genworth imposes other charges through

which it recoups administrative costs and earns a profit, such as a premium expense charge of 9% of all premiums collected. Collectively, these charges constitute the entire premium that a policyholder pays, and the insurer can earn additional profit from investing the amounts held in the policies' account value.

5.  But plaintiff, along with numerous other Genworth policyholders, has been forced to pay inflated COI charges that are not allowed by the plain language of their insurance contracts. Despite its commitment that monthly COI rates will be determined "according to expectations of future mortality," Genworth has left its COI rates unchanged for decades in the face of significantly improved mortality experience and expectations both industry-wide and within Genworth. In doing so, Genworth has converted COI charges from being a cost-reimbursement mechanism to a profit vehicle (determined according to numerous other factors having nothing to do with expectations of future mortality) and reaping tens—if not hundreds—of millions of dollars in excess COI charges.

6.  It is now well-documented that nationwide mortality expectations have *improved* significantly over the past several decades. The Society of Actuaries and the American Academy of Actuaries periodically publish mortality tables based on information collected from America's largest insurers. Those tables show that mortality rates have improved at a rate of roughly 1% per year over the past three decades. Genworth's own regulatory filings confirm that Genworth has benefited from this improvement and that it expects these historical trends to continue into the future. Genworth acknowledged as recently as February 5, 2018 that:[1]

> Anticipated future experience factors differ from current experience. This difference is generally in the nature of anticipating continuation of recent trends for some time in the future. Mortality is anticipated to continue to slowly *improve*.

---

[1] *See* Genworth Life & Annuity Insurance Company's 2017 Non-Guaranteed Elements Opinion for Exhibit 5, dated February 5, 2018.

7. Genworth made similar representations in its regulatory filings for every year between 2009 and 2017. This means that for at least the past 9 years Genworth expected—and continues to expect—mortality rates to go down and insureds to live longer than Genworth originally anticipated when the policies at issue were first priced. This, in turn, means that Genworth's cost of providing insurance has decreased. Despite these continuously improved mortality expectations and corresponding decrease in mortality risk, however, Genworth has never once lowered the COI rates it charges its customers. Genworth, instead, has wrongly construed its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to increase COI rates if there were to be an unexpected pandemic that made mortality worse than anticipated, but not requiring it to decrease COI rates in the face of years and years of improved mortality experience—an improvement that has, in fact, already occurred. This position has no merit and Genworth is violating the plain terms of its contracts with policyholders.

8. Genworth also has wrongly determined its COI rates "according to" factors not permitted by the contract—i.e., factors other than its "expectations of future mortality." After noting in its regulatory filings that improved mortality expectations "would affect the levels of premiums charged," Genworth stated that there would be "no specific matching of any one assumption to one particular non-guaranteed element." This statement conflicts with the terms of the policies, which expressly require that COI rates be determined according to mortality expectations, and not to any other assumptions. Genworth's filings also show that Genworth engaged in a prohibited practice called "profit loading," whereby an insurer improperly adds a profit margin on top of projected mortality rates when determining COI rates. This practice also

violates the terms of the subject policies, as profit is not a "cost" of insurance—profit and costs are antonyms, nor is it a factor upon which COI rates can permissibly be determined.

9. In sum, Genworth has violated and continues to violate its contractual commitment to policyholders to determine COI rates "according to expectations of future mortality." It has refused to decrease COI rates over the course of three decades despite improving future mortality expectations, and it has loaded COI rates with profit and other impermissible considerations. Plaintiff therefore seeks monetary relief for the COI overcharges that Genworth has wrongly imposed on Plaintiff and the proposed Class.

## THE PARTIES

10. Plaintiff TVPX ARS Inc., as securities intermediary for Consolidated Wealth Management, Ltd., is a corporation organized under the laws of Wyoming with its principal place of business in Utah. Plaintiff, as securities intermediary for Consolidated Wealth Management, Ltd., is the owner of a Flexible Premium Adjustable Life Insurance Policy, policy number 1948968, insuring the life of Lucius Whitaker, which was issued on or about February 11, 1984 by Genworth's predecessor, The Life Insurance Company of Virginia, with a face value of $150,000 (the "Whitaker Policy"). On August 30, 2017, Genworth confirmed a request to change the ownership of record for the Whitaker Policy to Plaintiff, who is identified as the owner of the Whitaker Policy in the records of Genworth. At issuance, Mr. Whitaker was age 51. On information and belief, the Whitaker Policy has not received any COI rate decrease since it was issued.

11. Defendant Genworth Life and Annuity Insurance Company is a corporation organized and existing under the laws of Virginia, having its principal place of business in Richmond, Virginia.

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member (including Plaintiff) and one defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

13. This Court has personal jurisdiction over Genworth because it has its principal place of business in Richmond, Virginia.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to plaintiff's causes of action occurred in this District, including Genworth's COI rate overcharge.

**FACTUAL BACKGROUND**

**A. Cost of Insurance**

15. The policies at issue are flexible-premium, UL policies issued by Genworth (or its predecessors) in the 1980s, 1990s, and/or 2000s. They were all issued on standardized policy forms and insureds are not permitted to negotiate different terms. Exhibit A to this Complaint is a representative policy—the Whitaker Policy—without the application. The class on whose behalf this action is being brought consists of all policies issued on (i) the same policy form as the Whitaker Policy and (ii) any other Genworth (or its predecessors') policy forms that disclose expectations of future mortality as the sole factor upon which COI rates are determined. These policies are referred to herein as "COI Class Policies."

16. UL policies combine death benefits with a savings or investment component, often known as the "cash value" or "account value." One benefit of UL policies is that they

6

permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is deducted from the cash value (i.e., the savings component) of the policy on a monthly basis, so the policyholder forfeits the COI charge entirely to Genworth. Any premiums paid in excess of COI charges and other charges are applied to a policy's cash value. These excess premiums earn interest at the credited rate. This structure is beneficial because it allows policyholders the choice to either (i) minimize their capital investment and generate greater rates of return through other investments or (ii) to use the UL policy as a savings vehicle and earn interest on the cash value.

17. The COI charge is supposed to be the insurer's cost of providing mortality coverage. The size of the COI charge is highly significant to universal life policyholders. First, it dictates the minimum amount of money that must be paid to keep a policy in force. Second, high COI rates can quickly diminish a policy's cash value and reduces the amount of money on which interest can be earned. Absent a secondary guarantee, if the cash value diminishes such that COI charges can no longer be deducted, then the policy will go into grace and, if no additional premiums are paid after adequate time provided by an accurate grace notice, the policy may lapse.

18. COI charges are one of several "non-guaranteed elements" in a UL policy. Non-guaranteed elements, or NGEs, are policy factors that can change in response to anticipated experience, subject to guaranteed minimums and/or maximums and other contractual and legal constraints. Other NGEs include the credited interest rate—the rate on which amounts in account value earn interest—and the loan interest rate.

19. The Whitaker Policy provides that COI rates will be determined as follows:

> *Cost of Insurance Rate.*  The monthly rate is based on the insured's sex, attained age, policy duration and risk class.  **The rates are determined by us according to expectations of future mortality.** We can change the rates from time to time, but they will never be more than the maximum rates shown in the *Table of Guaranteed Maximum Insurance Rates.*  A change in rates will apply to all persons of the same age, sex and risk class and whose policies have been in effect for the same length of time.

(bold added, italics in original).

20. The COI Class Policies are known in the insurance industry as "Single Consideration Policies" because the only factor that the carrier can and must consider when determining COI rates is "expectations of future mortality."  Nothing else.  Because the COI rates on the COI Class Policies must be determined according to expectations of future mortality, COI rates must be lowered if those expectations improve.

21. By contrast, Genworth has issued other insurance policies that do not require it to determine its COI rates according to expectations of future mortality alone, when that is its intention. For example, Genworth has also issued other universal life insurance policies that provide that COI rates "are determined according to [Genworth's] expectations of future experience for mortality, **lapse, interest and expenses**." (emphasis added).  These types of policies are known in the insurance industry as "Multi-Consideration Policies," because they allow insurers when determining COI rates to use other factors in addition to expectations of future mortality.

22. Genworth has not decreased its COI rates for COI Class Policies, despite the fact that mortality rates, and Genworth's expectations of future mortality, have improved steadily over the past several decades.  This means that people are living much longer than Genworth anticipated when the COI Class Policies were priced and issued. This, in turn, reduces Genworth's cost of providing pure insurance coverage (i.e., paying death benefits), because its

mortality risks have diminished. Under the terms of the COI Class Policies, this decrease in costs is supposed to be passed along to policyholders in the form of a COI decrease, just as Genworth has the right to prospectively raise COI rates if mortality costs increase. Genworth, however, has failed to adjust COI rates in the face of improving mortality expectations, has ignored (or discarded) its own expectations of future mortality, and instead continued to determine and impose COI charges that are far in excess of what Genworth is contractually permitted to charge.

**B.     Improving Mortality and Genworth's Unlawful Failure to Determine COI Rates According to Expectations of Future Mortality**

23.     Insurers like Genworth systematically quantify their "expectations of future mortality" on an annual or biennial basis. They perform experience studies which examine their historical mortality experience and, from that mortality experience, develop predictions of mortality they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status and duration since underwriting. Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect the carrier's expectations of future mortality.

24.     Beginning at least as early as 1941, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that are commonly used by insurers

9

to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.

25. The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.[2]

26. The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables are showing a substantial improvement in mortality in a 20-year time period. These mortality improvements represent a substantial benefit that Genworth should have passed on to policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

27. The SOA established a committee to develop an update of the CSO tables. A report on the updated CSO tables by the SOA was published in October 2015 and showed further

---

[2] *See* Report of the American Academy of Actuaries' Commissioner's Standard Ordinary (CSO) Task Force, Presented to the National Association of Insurance Commissioners' Life and Health Actuarial Task Force (LHATF), June 2001, *available at* http://www.actuary.org/pdf/life/cso2_june01.pdf.

10

significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

28. The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the SOA. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975-1980 Basic Select And Ultimate Mortality Table
- 1985-90 Basic Select and Ultimate Mortality Tables
- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

29. The 1990-95 Basic Table reflected the death rates observed by 21 large life insurance companies with policy anniversaries between 1990 and 1995.  The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently.  The report states: "The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee (ILEC) have shown significant mortality improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development." Other surveys have also noted mortality improvements. In May 2013 the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rates and mortality improvements at older ages, which showed material rates of mortality improvements. The report was based on a survey of insurance companies – including Genworth.

In March 2014 the actuarial firm Milliman published a report sponsored by the SOA called "Select Period Mortality" showing select rates of mortality that are strongly improved over 2001 VBT. Their report was based on a survey of insurance companies – including Genworth Financial.

30. Genworth has repeatedly acknowledged that, consistent with industry experience, its expectations of future mortality have improved. Each year, insurers are required to file annual interrogatory statements with the NAIC. These are sworn statements are certified and signed by an actuary. The interrogatories include questions regarding the setting of non-guaranteed elements (which include COI rates) and whether expectations have changed. For example, Question 4 asks: "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., COI rates] different from current experience?" In each of 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017, Genworth included substantially the same response to this question:

> Yes—Anticipated future experience factors differ from current experience. This difference is generally in the nature of ***anticipating continuation of recent trends for some time into the future***. *Mortality is anticipated to continue a slow improvement*…
>
> These ***anticipated factors would affect the levels of premiums or cost of insurance rates charged***, as well as interest rate credited, with no specific matching of one assumption to one particular non-guaranteed element.

(emphasis added). Genworth has therefore acknowledged the trend of improved expectations of future mortality, and admits that it expects this trend to continue. Further, it admits that this "would affect the levels of premiums or cost of insurance rates changed." But, despite repeating this statement in every annual statement for almost a decade, Genworth did not reduce COI rates a single time.

31. Beyond its failure to reduce COI rates in response to improved expectations of future mortality, Genworth's statement that experience assumptions are not "specifi[ally]

matched" to "one particular non-guaranteed element" also indicates that Genworth is charging COI rates according to impermissible factors. Under the terms of the COI Class Policies, COI rates must be determined according to Genworth's expectations of future mortality, and nothing else. Genworth is not permitted to mix-and-match assumptions and the NGEs, such as by using investment income expectations to determine COI rates. By doing so, Genworth has impermissibly converted the COI Class Policies from Single Consideration Policies to Multi-Consideration Policies.

32. Genworth is also not permitted to determine its COI rates according to profit margins. In recent years, it has been discovered that certain issuers of Single Consideration Policies have wrongly been embedding profit margins into their mortality charges in breach of such policies. On information and belief, it appears highly likely that Genworth engaged in this same unlawful conduct.

33. Genworth has concealed its wrongdoing from policyholders: the monthly COI rates used to calculate COI charges are not disclosed to policyholders, nor are Genworth's mortality expectations. Genworth's regulatory filings, however, when read by an experienced insurance professional, reveal that Genworth is failing to decrease COI rates in response to improved mortality expectations and using improper factors in setting COI Rates.

## CLASS ACTION ALLEGATIONS

34. This action is brought by Plaintiff individually and on behalf of a class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to as the "COI Overcharge Class"—consists of:

> All current and former owners of universal life (including variable universal life) insurance policies issued or administered by Genworth Life and Annuity Insurance Company, or its predecessors, that provide: (1) an insurance or cost of insurance charge or deduction calculated using a rate according to expectations of

future mortality; 2) additional but separate policy charges, deductions, or expenses; 3) an investment, interest bearing, or savings component; and 4) a death benefit.

The COI Overcharge Class does not include defendant Genworth, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

35. The class consists of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Genworth.

36. The claims asserted by plaintiff are typical of the claims of the COI Overcharge Class.

37. The plaintiff will fairly and adequately protect the interests of the Class and does not have any interests antagonistic to those of the other members of the Class.

38. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

39. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

40. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the Class predominate over any individualized issues. Those common questions that predominate include:

(a) the construction and interpretation of the form insurance policies at issue in this litigation;

(b) whether Genworth's failure to decrease the COI rates imposed on the COI Overcharge Class violated the terms of those form policies;

    (c) whether Genworth determined COI rates according to factors other than expectations of future mortality;

    (d) whether Genworth breached its contracts with plaintiff and members of the COI Overcharge Class;

    (f) whether Genworth's expectations of future mortality have improved; and

    (g) whether plaintiff and members of the COI Overcharge Class are entitled to damages as a result of the unlawful conduct by defendant as alleged herein and the methodology for calculating those damages.

  41. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    (a) the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

    (b) when Genworth's liability has been adjudicated, claims of all class members can be determined by the Court;

    (c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

    (d) without a class action, many class members would continue to suffer injury, and Genworth's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

42. Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of plaintiff and the COI Overcharge Class.

43. The COI Class Policies are binding and enforceable contracts.

44. Genworth breached the terms of the COI Class Policies by impermissibly charging COI rates that were determined by Genworth not according to its expectations of future mortality. These overcharges include, but are not limited to, the excess COI charges that Genworth deducted by not reducing COI rates according to improved expectations of future mortality.

45. Genworth's failure to decrease COI rates also violated the contracts' uniform requirement that Genworth calculate the COI monthly because any such calculation would have shown the need to decrease COI rates due to improved expectations of future mortality.

46. Plaintiff and the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Genworth's conduct as set forth herein.

47. As a direct and proximate cause of Genworth's material breaches of the policies, plaintiff and the COI Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFOR, plaintiff and the COI Overcharge Class pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding plaintiff and the class compensatory damages;

3. Awarding plaintiff and the class pre-judgment and post-judgment interest, as well as costs; and

4. Awarding plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff and the class hereby demand a trial by jury as to all issues so triable.

    TVPX ARS INC., as Securities Intermediary for CONSOLIDATED WEALTH MANAGEMENT, LTD., on behalf of itself and all others similarly situated

    By Counsel

Dated: September 19, 2018    Respectfully submitted,

*/s/* David J. Gogal
David J. Gogal, VSB No. 28815
Laurie L. Kirkland, VSB No. 75320
BLANKINGSHIP & KEITH, P.C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
Tel: 703-691-1235
Fax: 703-691-3913
dgogal@bklawva.com
lkirkland@bklawva.com

Steven G. Sklaver
(*pro hac vice* application to be filed)
Glenn C. Bridgman
(*pro hac vice* application to be filed)
Oleg Elkhunovich
(*pro hac vice* application to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:    310-789-3100
Fax:    310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
oelkhunovich@susmangodfrey.com

Seth Ard
(*pro hac vice* application to be filed)
Ryan Kirkpatrick
(*pro hac vice* application to be filed)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:   212-336-8330
Fax:    212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

*Attorneys for Plaintiff*